FILED
United States Court of Appeals
Tenth Circuit

October 30, 2013

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

LIVIA S. WEST,

      Petitioner-Appellee,

v.

      Nos. 12-4159 & 12-4205

STANISLAV D. DOBREV,

      Respondent-Appellant.

### APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF UTAH
### (D.C. No. 12-CV-819-DB)

Charles L. Perschon of Prince, Yeates & Geldzahler, PC, Salt Lake City, Utah, for Petitioner-Appellee.

David S. Dolowitz and James M. Hunnicutt of Dolowitz Hunnicutt, Salt Lake City, Utah, for Respondent-Appellant.

Before **GORSUCH**, **BALDOCK**, and **BACHARACH**, Circuit Judges.[*]

**BALDOCK**, Circuit Judge.

---

      [*] After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. See Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

One aim of the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 1988 WL 411501, is to deter a parent dissatisfied with a current custodial arrangement from wrongfully retaining a minor child outside his or her country of residence while seeking a more favorable arrangement elsewhere. Unfortunately, the Convention did not deter Respondent Stanislav Dobrev from seeking a custodial arrangement from a Utah State court more favorable than the arrangement he received from a French court just a few weeks prior. The Utah federal district court would have none of it—and rightly so. A week after holding a preliminary hearing, the district court, pursuant to the Convention and its implementing legislation, The International Child Abduction Remedies Act (ICARA), 42 U.S.C. §§ 11601–611, summarily granted Petitioner Livia West's petition for return of her two minor children to their residence in Belgium. On top of that, the district court awarded Petitioner $21,697.50 in fees, $410.80 in costs, and $4,307.61 in expenses. Respondent appeals, generally claiming a denial of due process based on the district court's refusal to provide him an evidentiary hearing. We exercise jurisdiction under 28 U.S.C. § 1291, and affirm.[1]

I.

ICARA provides federal district courts with original jurisdiction (concurrently

---

[1] Last term in Chafin v. Chafin, 133 S. Ct. 1017 (2013), the Supreme Court held the return of a child to his or her country of residence pursuant to the Hague Convention and ICARA does not render moot an appeal from the underlying district court order granting such relief.

with state courts) over petitions seeking the return of children under the Hague Convention. 42 U.S.C. § 11603(a). As to the admission of such petitions and related documents into evidence, ICARA provides:

> With respect to . . . any petition to a court under section 11603 of this title, which seeks relief under the Convention, or any other documents or information included with such . . . petition or provided after such submission which relates to the . . . petition, . . . no authentication of such . . . petition, document, or information shall be required in order for the . . . petition, document, or information to be admissible in court.

Id. § 11605. Given the district court in this case granted judgment to Petitioner based on the pleadings and attachments thereto, we glean the relevant facts from the documentary evidence consistent with § 11605, as well as from the transcript of the preliminary hearing. In Part I.A., we recite the facts pervading this controversy as set forth in the French court's final decree—a judicial decree to which we defer on the basis of comity absent good reason to the contrary.[2] In Part I.B., we recite the procedural history of the case and recount the district court's disposition. In Parts II.A., B., and C., we consider Respondent's challenges to that disposition consistent with the Convention and ICARA.[3]

---

[2] Article 14 of the Convention tells us that in deciding whether the children have been wrongfully retained in violation of the Convention's terms, we "may take notice directly" of the French decree "without recourse to the specific procedures for the . . . recognition of foreign decisions which would otherwise be applicable." 1988 WL 411501, at *5.

[3] On appeal from the grant of a petition for return of a child under the Convention and ICARA, we generally review the district court's findings of fact for clear error and its conclusions of law de novo. Shealy v. Shealy, 295 F.3d 1117,

(continued...)

3

A.

Petitioner West, a lawyer, is a citizen of Romania and the United States. Respondent Dobrev, a college professor, is a citizen of Bulgaria and the United States. The two were married in 2003 in Chicago, Illinois. They have two children, a female born January 27, 2004 and a male born January 12, 2006. Both children are citizens of the United States. In June 2008, the couple and their children moved to Fontainbleau, France after Respondent accepted a teaching position at a local university. In May 2009, Petitioner filed for divorce in "Fontainbleau Departmental Court." In an interim order dated October 2009, the French court ordered the children to "remain in the usual home of the mother," and Respondent to pay for their support. Appellant's Appendix (Aplt's App.) (Appeal 12-4159) at 38.

Respondent left his position with the local university in early February 2010. At that point, Respondent, contrary to the court's order, ceased support payments. In May 2010, Respondent accepted employment as a professor at the University of Utah in Salt Lake City, but did not resume payments. Meanwhile, in March 2010, Petitioner asked the French court for permission to move to Brussels, Belgium. Petitioner represented that "without resources, and after having searched in vain for

---

[3](...continued)
1121 (10th Cir. 2002). Because here the district court summarily granted the petition without an evidentiary hearing, Respondent argues with some basis that we must review the court's order of return de novo. We need not decide the applicable standard of review, however, because the outcome remains the same regardless of the standard we employ.

4

employment in the U.S., she had to expand her search and . . . found a job at the European Commission in [Brussels] Belgium." Id. at 40. Respondent objected to Petitioner's request because she previously expressed her intent to relocate in the United States (a plan to which, according to the French court's findings, Respondent also objected). In a second interim order dated June 2010, the court "[a]uthorized the mother to move to Brussels as long as she notifie[d] her husband at least 15 days before leaving France." Id. at 38. The court further ordered the children to remain in the primary physical custody of their mother. Petitioner and her children moved to Brussels in August 2010.

In the French proceeding, Respondent raised numerous arguments as to why the court should award him physical custody of the children. Respondent never argued, however, that Petitioner abused the children, physically or psychologically. One of Respondent's principal arguments was Petitioner hid her intention to move to Brussels with the children "where she prevents him from seeing his children." Id. at 41. The French court was unpersuaded and in its final decree found:

> Ms. West did not hide anything and . . . took the precaution of obtaining [the] court's authorization before moving. Such authorization was given by the decision of June 2, 2010 . . . .
> ***
> Mr. Dobrev does not prove that the mother prevented him from seeing his children. . . . [T]he exchange of emails between the spouses submitted as evidence took back [Mr. Dobrev's] initial consent of having the children enrolled at the European School in Brussels, indicating that he had enrolled the children instead at a school in the United States, and threatened the mother to bring them back to the United States. Ms. West could treat these threats seriously given that

5

Mr. Dobrev and the children were of American nationality. After this exchange she subordinated the exercising of his access and visitation rights to the condition that Mr. Dobrev return the U.S. passports of the children, which he refused. An intervention of the court's order of November 25, 2010 was necessary so that Mr. Dobrev accept to remit the children's passports to his wife.[4] Mr. Dobrev did not invoke any difficulties in exercising his access and visitation rights after this order.

Id. at 45. The court found upon all the facts presented that the divorce was the "exclusive fault of Mr. Dobrev," and "in the context of joint exercising of parental authority [*i.e.*, joint custody] the usual home of the children must be maintained at their mother's home." Id. at 45, 49. At no time does Respondent appear to have contested the French court's jurisdiction to adjudicate the matter of the children's custody. On July 24, 2012, four weeks after entry of the decree, Respondent waived his right to appeal, thereby finalizing the decree and terminating the French proceeding.[5]

B.

Prior to waiving his right to appeal, Respondent picked up the children on

---

[4] Around the same time, Petitioner also applied to a Belgium court for return of the children's passports as an additional precaution against Respondent's threat to remove the children to the United States. As best we can discern from the translation of its decision, the Belgium court rejected Petitioner's application because the French court's order providing Petitioner relief was binding in Belgium. See Aplt's App. (Appeal 12-4159) at 150–51.

[5] Respondent tells us: "The decree of divorce from Fontainbleau, France was entered on June 27, 2012. . . . [I]f neither party resides in France, the court insists that the parties wait 90 days [before entry of the final decree] to determine if one or either is going to appeal the court's decision." Aplt's App. (Appeal 12-4159) at 155–56.

6

July 11 and brought them to the United States to vacation consistent with the terms of the final decree. The children were scheduled to return to Belgium on August 12, 2012, but did not return. Instead, on August 8, Respondent filed suit in Utah state court for "Emergency Jurisdiction and Custody." Id. at 154. Respondent first asked the state court to exercise jurisdiction over the children because supposedly no other country, including Belgium, had jurisdiction over them (the French decree was now conveniently final). Respondent next asked the state court to award him temporary custody of the children for the reason that if they were returned to their mother in Belgium "such a return would pose a grave risk of physical and psychological harm to each child or otherwise place each child in an intolerable situation, as contemplated by Article 13(b) of the Hague Convention." Id. at 155. Respondent alleged or could have alleged before the French court many of the facts he now alleged in his state petition. In his state suit, Respondent alleged for the first time that "[d]uring the years the parties were married and during the time [Ms. West] and the children lived in France and Belgium, [he] has been concerned about [her] treatment of the children." Id. at 168.

On August 23, Petitioner petitioned the Utah federal district court for return of the children pursuant to Article 3 of the Hague Convention and ICARA, 42 U.S.C. § 11603(b). Belgium, France, and the United States are all signatories to the Convention. Petitioner included with her petition (1) a letter from the director of the children's elementary school in Brussels containing favorable comments from the

7

children's teachers, (2) the older child's school records showing average or above average marks, and (3) a letter from a neighbor tenant in Brussels containing favorable comments about the family. A few days prior, the State Department notified the Utah state court that Petitioner also had submitted an administrative application for return of the children pursuant to Article 8 of the Convention. See 1988 WL 411501, at *3–4. That application stayed the state court proceeding pursuant to Article 16, which prohibits a court of a signatory state from adjudicating the merits of a custody dispute "until it has been determined that the child is not to be returned under this Convention." Id. at *5.

Respondent answered Petitioner's federal suit by again disputing many of the facts found in the French court's final decree (from which he was free to appeal before waiving his right to do so). He denied he wrongfully retained the children from their residence in Belgium. Rather Respondent again asserted, this time as an affirmative defense, that he properly retained the children under Article 13(b) of the Convention because they faced a grave risk of harm if returned to their mother. See id. at *4–5. Respondent submitted a letter from a clinical psychologist whom he hired to interview the children after they reportedly expressed dissatisfaction with their current living arrangement in Belgium. According to the psychologist's letter, Petitioner reportedly (1) had little time for the children, (2) disciplined the children by slapping them, pulling their hair, and spanking them, and (3) failed to provide them adequate medical or hygienic care. On one unspecified occasion, Petitioner

8

reportedly pushed her daughter down after chasing and catching her. The letter concluded: "It is strongly suggested that the children's current living situation be investigated and that the children continue to receive therapy." Aplt's App. (Appeal 12-4159) at 211. Respondent asked "the court to appoint an additional therapist to evaluate both the children and determine if there has been abuse and, if so, what kind, how serious, and does it justify retention." Id. at 258.

Six days after the federal petition's filing, the district court held a preliminary hearing during which it raised questions about the need for an evidentiary hearing. The court asked Petitioner's counsel whether he agreed with Respondent that an evidentiary hearing was necessary. Counsel responded "I do not" and explained:

> Based on the proffers and the allegations made in the filings by the Respondent, they don't come close to rising to a grave risk that the return of the children would expose them to physical or psychological harm or otherwise place them in an intolerable situation. This is forum shopping at its worst. This is what this [Convention] was designed to prevent.

Id. at 263–64. Much to the district court's befuddlement, Respondent's attorney told the court that the psychologist who had interviewed the children would not testify at an evidentiary hearing due to ethical considerations:

> I would like to develop the case so I can present it to you, but I need another psychologist appointed and Ms. West directed to cooperate with that. That is the best way of finding out if there is not any abuse, because if she cooperates, and I am sure she is going to deny [the abuse], then we have [a psychologist] that is presenting here is what the children have said and here is what [Ms. West] said, and my opinion as a psychologist is there is abuse or there is not abuse.

9

Id. at 268–69.

The district court expressed frustration with Respondent's position:

[The Court]: Obviously the easiest and quickest hearing would be to hear from this doctor who claims, and . . . upon which you base your opinion or your claim that abuse has taken place. That is the one that I am still trying to get my mind around. In most cases that involve . . . both mental and physical abuse, . . . even if there is a privilege, they remove the privilege for purposes of a legal determination because they put it at issue.

And here I assume the kids didn't go to the therapist on their own. I mean, these six and eight year old kids didn't say I think I need to see a therapist. . . . [T]hey went to the therapist at the insistence of their father.

Then we say, oh, but the person who evaluated them for the purpose of telling the court that there is abuse here, based on what the therapist is going to say, we can't hear from that therapist. It is all kind of strange to me. Apparently you don't want me to hear from the children.

[Respondent's Attorney]: I suspect you could, but I don't know – from what I understand, children are not necessarily the most reliable witnesses, but if that is what it would take –

[The Court]: But they are reliable witnesses for the therapist?

[Respondent's Attorney]: I am assuming that is as the result of a lot of training and experience. I get in enough trouble trying to tell if my own kids are telling me the truth . . . .

Id. at 275–76.

During the preliminary hearing the district court never stated it would hold an evidentiary hearing. And Respondent never suggested due process required an evidentiary hearing. Rather, Respondent claimed only that the evidence before the court was sufficient to warrant further inquiry. At one point the court stated: "Let

10

me review what [the parties] have submitted and then decide whether there is enough to have a hearing on the matter of abuse." Id. at 270. Respondent well understood the court's position: "I understand the court now may want to hold a hearing, depending on what it sees after reading the answer to the petition . . . ." Id. at 271. The conversation continued:

> [The Court]: If a hearing is warranted, I will try to do it as soon as possible. I have not made that decision yet, but I will try to do it this week, if a hearing is necessary. . . .
>
> [Respondent's Attorney]: [W]hat I would suggest as part of your decision, if there is going to be a hearing and if the court directs the appointment of one of the three [psychologists] we have nominated, . . . I would ask them to prioritize what they are doing. . . .
>
> [Petitioner's Attorney]: We would object to [an evidentiary hearing], Your Honor. As noted, the best place to have that determination [of abuse] made is in Belgium where the Belgium court does have jurisdiction because the kids have lived there for two years. . . .

Id. at 274–75.

A week later the district court decided no evidentiary hearing was necessary. On September 5, the court issued a brief written decision summarily granting the petition and ordering Respondent to "immediately" return the children to Petitioner "for their safe return with her to Belgium." Id. at 241. The court identified the question presented as whether Respondent had shown as required by Article 13(b) of the Convention "a grave risk the children will be exposed to physical or psychological harm or otherwise be placed in an intolerable situation if they are returned to Belgium." Id. at 240. The court answered "no." Id. The court explained

11

that, "even on its face," the evidence of abuse Respondent presented, in particular, the uncorroborated letter of the clinical psychologist (aside from his own allegations), "is far from demonstrating a 'grave risk' that a return to Belgium will expose the children to physical or psychological harm or otherwise place them in an intolerable situation." Id. at 241. The court instructed Respondent to address his concerns to a Belgium court where the children reside or to the French court that rendered the divorce decree. A few days later, the court ordered Respondent to pay Petitioner's fees, costs, and expenses pursuant to ICARA, 42 U.S.C. § 11607(b)(3).

## II.

ICARA provides "[t]he court in which an action is brought under [§ 11603(b)] shall decide the case in accordance with the Convention."[6] 42 U.S.C. § 11603(d). The Convention does not provide a means by which to determine "the merits of . . . child custody claims." Id. § 11601(b)(4). Rather, the Convention seeks "to prevent parents from abducting children in order to avoid the jurisdiction of courts with whose [custody] rulings they do not or believe they will not agree." Shealy v. Shealy, 295 F.3d 1117, 1121 (10th Cir. 2002) (internal parenthesis omitted). The

---

[6] Section 11603(b) provides:
Any person seeking to initiate judicial proceedings under the Convention for the return of a child . . . may do so by commencing a civil action by filing a petition . . . in any court which has jurisdiction of such action and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed.
42 U.S.C. § 11603(b).

12

principal aims of the Convention are to "prevent an international version of forum-shopping," "defeat attempts to re-litigate custody matters," Navani v. Shahani, 496 F.3d 1121, 1128–29 (10th Cir. 2007), and "facilitate custody adjudications, *promptly and exclusively*" in the child's country of residence, Chafin v. Chafin, 133 S. Ct. 1017, 1028 (2013) (Ginsburg, J., concurring) (emphasis added).

Consistent with these aims, Article 11 of the Convention provides "[t]he judicial . . . authorities of Contracting States shall act *expeditiously* in proceedings for the return of children." 1988 WL 411501, at *4 (emphasis added). Article 18 adds the provisions of the Convention "do not limit the power of a judicial . . . authority to order the return of the child *at any time*. Id. at *5 (emphasis added). Unfortunately for Respondent, this surely means a district court has a substantial degree of discretion in determining the procedures necessary to resolve a petition filed pursuant to the Convention and ICARA. Specifically, neither the Convention nor ICARA, nor any other law of which we are aware including the Due Process Clause of the Fifth Amendment, requires "that discovery be allowed or that an evidentiary hearing be conducted" as a matter of right in cases arising under the Convention. March v. Levine, 249 F.3d 462, 474 (6th Cir. 2001). Where circumstances warrant, both the Convention and ICARA provide the district court with "the authority to resolve these cases without resorting to a . . . plenary evidentiary hearing." Id.

13

A.

ICARA says "[c]hildren who are wrongfully removed or retained within the meaning of the Convention are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies." 42 U.S.C. § 11601(a)(4). Petitioner bore the initial burden of establishing by a preponderance of the evidence that Respondent wrongfully retained the children past their scheduled return date to Belgium. Id. § 11603(e)(1)(A). Consistent with Article 3, Petitioner's prima facie case consisted of three elements (1) the children habitually resided in a signatory state at the time of their retention, (2) such retention breached Petitioner's custody rights under the law of that state, and (3) Petitioner was exercising those rights at the time of retention.[7] Shealy, 295 F.3d at 1122.

On appeal, Respondent claims he was denied due process because the district court provided him no opportunity to challenge its finding that Belgium was

---

[7] Article 3 of the Convention provides in relevant part:
The removal or the retention of a child is to be considered wrongful where—
(a)    it is in breach of rights of custody attributed to a person, . . . under the law of the State in which the child was habitually resident immediately before the removal or retention; and
(b)    at the time of the removal or retention those rights were actually exercised, . . . or would have been so exercised but for the removal or retention.
The rights of custody mentioned in sub-paragraph a) above, may arise in particular by operation of law or by reason of a judicial . . . decision, . . . .
1988 WL 411501, at *2.

14

the "habitual residence" of the children. At the preliminary hearing, however, Respondent never challenged any element of Petitioner's prima facie case as alleged in her petition—although he had ample opportunity to do so. Perhaps this is because Respondent admitted Petitioner's allegations established a prima facie case for return of the children. In ¶ 22, Petitioner alleged:

> At the time of the children's wrongful removal and retention . . . Petitioner was actually exercising custody rights within the meaning of Articles Three and Five of the Convention, in that she is the biological mother of the children and has exercised custody rights over her children since they were born, and she was awarded joint physical custody, joint legal custody, and primary physical custody of the children pursuant to the [French] Decree. *Furthermore, the Children were habitually residents of Belgium within the meaning of Article 3 of the Convention since their move to Belgium in August 2010.*

Aplt's App. (Appeal 12-4159) at 14 (footnote omitted) (emphasis added). In ¶ 22 of his response, Respondent "[a]dmit[s] the allegations of ¶ 22 of the petition except that the actions of Respondent are not wrongful but fully in accord with the provisions of Article 13(b) of the Convention." Id. at 142.

Notwithstanding his plain admission in ¶ 22 that the children had been habitual residents of Belgium since August 2010, Respondent says he contested the same when he denied in ¶ 3 of his response Petitioner's allegation in ¶ 3 of her petition that the children had "been wrongfully removed from their habitual residence." Id. at 139. We think not. Respondent never denied that Belgium was the habitual residence of the children within the meaning of Article 3; rather he denied *only* that the children were *wrongfully removed or retained* from that residence based on his

15

own allegations of child abuse pursuant to Article 13(b).  To further prove the point, Petitioner again alleged in ¶ 29 of her petition that "[a]t the time immediately before the wrongful removal of the children from Belgium, the children habitually resided in Belgium within the meaning of Article 3 of the Convention."  Id. at 16. Respondent answered: "Deny the allegations of ¶ 29 of the petition insofar as they assert a wrongful removal of the children from Belgium and admit the remaining allegations of the paragraph . . . ."  Id. at 143.  Of course, a "remaining allegation" of ¶ 29 was that "the children habitually resided in Belgium."  Respondent's belated claim that he was entitled to an evidentiary hearing to challenge Petitioner's prima face case is meritless.

### B.

Because Petitioner alleged a prima facie case for return of the children under Article 3 of the Convention and Respondent did not deny those allegations, the burden shifted to him to establish one of the affirmative defenses or "*narrow* exceptions set forth in the Convention."  42 U.S.C. § 11601(a)(4) (emphasis added). By now the reader understands we are concerned only with the exception contained in Article 13(b):  A court is not bound to return a child wrongfully retained or removed if the respondent establishes "by clear and convincing evidence," 42 U.S.C. § 11603(e)(2)(A), that "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation," 1988 WL 411501, at *4–5.  "Grave risk" means the "potential harm to the

16

child must be severe, and the level of risk and danger . . . very high." Souratgar v. Lee, 720 F.3d 96, 103 (2d Cir. 2013).

Whatever one must show to establish a "grave risk" to a child under Article 13(b) (a query we need not definitively answer here), we are certain Respondent did not make that showing before the district court "by clear and convincing evidence."[8] 42 U.S.C. § 11603(e)(2)(A). "If we are to take the international obligations of American courts with any degree of seriousness, the exception to the Hague Convention for grave harm to the child[ren] requires far more than the evidence that [Mr. Dobrev] provides." Friedrich v. Friedrich, 78 F.3d 1060, 1067 (6th Cir. 1996). A letter from a psychologist, unavailable to testify, that (1) points to instances—how frequent or severe we do not know—reported by an eight and six year old of what may or may not amount to child abuse, and (2) recommends further investigation, is insufficient to satisfy Article 13(b)'s strict demand.

---

[8] The Second, Third, and Sixth Circuits have stated a child is exposed to a "grave risk" of harm within the meaning of Article 13(b) in at least two instances. First, a court generally should not order the return of a child to a zone of war, famine, or disease. Second, a court should not order the return of a child in cases of serious abuse or neglect, or extraordinary emotional dependence when the country of habitual residence for whatever reason may be incapable or unwilling to give the child adequate protection. See Baxter v. Baxter, 423 F.3d 363, 373 (3d Cir. 2005); Blondin v. DuBois, 238 F.3d 153, 162 (2d Cir. 2001); Friedrich v. Friedrich, 78 F.3d 1060, 1069 (6th Cir. 1996); but see Baran v. Beaty, 526 F.3d 1340, 1348 (11th Cir. 2008) (declining to impose on a respondent "a duty to prove that [a] child's country of habitual residence is unable or unwilling to ameliorate the grave risk of harm which would otherwise accompany the child's return"); Van de Sande v. Van de Sande, 431 F.3d 567, 571 (7th Cir. 2005) ("The rendering court must satisfy itself that the children will in fact, and not just in legal theory, be protected if returned to their abuser's custody.").

17

Nor was Respondent's proffer before the district court sufficient to warrant further inquiry culminating in an evidentiary hearing down the road. Absent a psychologist willing to testify, Respondent appears to have had little, if any, evidence to present at an evidentiary hearing beyond what he already presented to the district court. Respondent was reluctant to permit the court to interview the children, ages eight and six at the time, for fear they would not be "reliable witnesses." Aplt's App. (Appeal 12-4159) at 276. The transcript of the preliminary hearing confirms what Respondent really wanted was more time to investigate to "determine if there has been abuse, and, if so, what kind, how serious, and does it justify retention." Id. at 258. Respondent told the district court that appointing another psychologist, one willing to testify, "is the best way of finding out if . . . there is abuse or there is not abuse." Id. at 268–69. He tells us the same. In his prayer, he asks us to direct the district court "to order an evaluation be performed by a child psychologist to determine the existence and extent of child abuse." See March, 249 F.3d at 468 (rejecting respondents' argument that "the district court erred when it refused to allow discovery or a hearing on the merits prior to ruling on the petition, or otherwise permit them to develop their affirmative defense").

Respondent's procedural wants did not prove by clear and convincing evidence that the children were at "grave risk" of harm if returned to their mother in Belgium. We refuse to condone what appears to us under the totality of the facts presented a "fishing expedition" on the part of Respondent designed to "hook" an Article 13(b)

18

defense as part of another attempt before another court to obtain physical custody of the children. To condone Respondent's efforts would sabotage the underlying premise of the Convention, *i.e.*, that wrongfully removed or retained children be promptly returned to their country of habitual residence, in this case Belgium, so that a court there may resolve custody-related questions in the best interests of the children. See Souratgar, 720 F.3d at 106. The district court did not err in ordering the return of the children to Belgium based upon the pleadings as elucidated by the parties' arguments at the preliminary hearing. Respondent received a meaningful opportunity to be heard. That is all due process requires in the context of a Hague Convention petition.

C.

Lastly, Respondent asserts the district court erred in awarding Petitioner the fees, costs, and expenses associated with her petition. Article 26 of the Convention provides that upon ordering the return of a child, the court "may, where appropriate," also order the respondent to pay petitioner "necessary" fees, costs, and expenses incurred as a result of the wrongful removal or retention. 1988 WL 411501, at *7. ICARA, however, shifts the burden to a respondent to show why an award of fees, costs, and expenses would be "clearly inappropriate:"

> Any court ordering the return of a child pursuant to an action brought under § 11603 . . . shall order the respondent to pay necessary expenses incurred on behalf of the petitioner, including court costs, legal fees, . . . and transportation costs related to the return of the child unless the respondent establishes that such order would be clearly inappropriate.

19

42 U.S.C. § 11607(b)(3). The First Circuit has explained that under § 11607(b)(3), the district court "has a duty . . . to order the payment of necessary expenses and legal fees, subject to a broad caveat denoted by the words, 'clearly inappropriate." Whallon v. Lynn, 356 F.3d 138, 140 (1st Cir. 2004). Such caveat provides the district court "broad discretion in its effort to comply with the Hague Convention consistently with our own laws and standards." Id.; see also Chafin, 133 S. Ct. at 1022 (recognizing that under § 11607(b)(3), a court ordering the return of a child "generally must require" respondent to pay the fees, costs, and expenses associated with the return ).

Given the facts of this case, we see nothing to suggest the district court stepped beyond the bounds of its discretion in awarding Petitioner her fees, costs, and expenses. Based upon all we have written today, much of which certainly suggests Respondent is not blameless for the current state of affairs, we cannot say the award was "clearly inappropriate." The judgment of the district court is, in all respects,

AFFIRMED.[9]

---

[9] At the end of her response brief, Petitioner asks us to award her fees and costs on appeal. The extent of her argument is this: "ICARA's fee statute, 42 U.S.C. § 11607(b)(3), provides that West is entitled to recover her fees and costs after the return of the children. . . . Because West has continued to defend against Dobrev on appeal, the Court should award West her fees and costs." But § 11607(b)(3) is not worded as broadly as Petitioner says. The statute says "a court ordering the return of a child . . . shall order the respondent to pay" a petitioner's

(continued...)

[9](...continued)
fee, costs, and expenses. Are we "a court ordering the return of a child?" Petitioner makes no attempt to provide us with an answer to this question and we are not inclined to answer it for ourselves. See United States v. Wooten, 377 F.3d 1134, 1145 (10th Cir. 2004) (noting we generally will not consider issues a party adverts to in an opening brief in a perfunctory manner without developed argumentation). Accordingly, Petitioner's request for fees and costs on appeal is denied.